# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MAINE

| | |
|---|---|
| In re:<br>Philip A. LaMantia,<br>　　　　　　　　Debtor | Chapter 7<br>Case No. 18-10632 |
| David Page<br>& Susan Page,<br>　　　　　　　　Plaintiffs<br>　v.<br>Philip A. LaMantia,<br>　　　　　　　　Defendant | Adv. Proc. No. 19-1003 |

## MEMORANDUM OF DECISION

In this adversary proceeding, Mr. LaMantia has moved for judgment on the pleadings under Fed. R. Civ. P. 12(c). The complaint filed by Mr. and Mrs. Page paints a story of homeowners harmed, to a significant extent, by ill-placed trust in a residential contractor. The complaint does not, however, state any plausible claims for relief against Mr. LaMantia under the provisions of the Bankruptcy Code invoked by Mr. and Mrs. Page. For this reason, Mr. LaMantia's motion will be granted.

## ANALYTICAL FRAMEWORK

In most cases, the standard for evaluating a motion under Fed. R. Civ. P. Rule 12(c) mirrors that for evaluating a motion under Fed. R. Civ. P. 12(b)(6). *See* Harvey v. United Techs. (In re Harvey), 388 B.R. 440, 442 (Bankr. D. Me. 2008). To resolve the motion, the Court employs a two-pronged approach, beginning with identifying and disregarding allegations in the complaint that either amount to legal conclusions or merely parrot the elements of a cause of

action.  Ocasio-Hernández v. Fortuño-Burset, 640 F.3d 1, 12 (1st Cir. 2011).  In this first step, factual assertions may also be disregarded if they are so threadbare or speculative that they "fail to cross the line between the conclusory and the factual."  Peñalbert-Rosa v. Fortuño-Burset, 631 F.3d 592, 595 (1st Cir. 2011) (quotation marks omitted).  In the second step, the Court treats the remaining factual allegations in the complaint as true.  Ocasio-Hernández, 640 F.3d at 12.  Although generally confined to the pleadings, the Court may supplement the well-pleaded facts by considering documents incorporated into the complaint and facts susceptible to judicial notice.  R.G. Fin. Corp. v. Vergara-Nuñez, 446 F.3d 178, 182 (1st Cir. 2006).  The following facts are drawn from the homeowners' First Amended Complaint [Dkt. No. 11] (the "Complaint") and the exhibits attached thereto.  The Court assumes that these facts are true for the purpose of ruling on Mr. LaMantia's motion.

## FACTUAL BACKGROUND

Mr. and Mrs. Page (the "Plaintiffs") desired to improve their property by replacing an existing garage with a new garage.  In May 2018, Mr. LaMantia (the "Defendant") presented the Plaintiffs with a flyer advertising the services of his company, LaMantia Construction, Inc. ("LCI").  The Defendant represented that he was competent and qualified to undertake the Plaintiffs' project, advertising his values of hard work, honesty, and common sense, and his "superior customer service and quality craftsmanship at a fair price."  He stated that he "knew what he was doing" and that his work would result in the "best garage ever."  He told the Plaintiffs that the garage would be something they would be proud of and that their "neighbors would be asking who built it."  The Defendant also represented that LCI was insured.  Despite that representation, LCI did not have insurance.

In May 2018, the Plaintiffs and the Defendant signed a contract for the construction of a garage and a cabin.  The handwritten contract detailed the work to be done and set a price of

$45,147.77 for materials and labor.  The contract contemplated four payments in specified amounts.  It did not state that labor would be charged at an hourly rate, or otherwise suggest that the price was contingent on the amount of labor required.  Upon execution of the contract, the Plaintiffs paid $22,573.88 to the Defendant.  He assured the Plaintiffs that he "never asks for more money" and that if anything, they would "get a check back at the end."

In June 2018, the Plaintiffs made a second payment to the Defendant in the amount of $7,524.63.  The following month, a problem with the water table and the ground work arose, and the parties amended the contract to cover additional work necessitated by the problem.  The additional materials and labor were to cost $7,417.30, increasing the total price for the project to $52,595.07, to be paid in five payments.  In July, the Plaintiffs remitted the third payment to the Defendant in the amount of $11,248.28.  The Defendant asked the Plaintiffs to make all future payments in cash to hide them "since he was in bankruptcy."  He had, in fact, been in a chapter 13 case since May 1, 2018.[1]

Despite the Defendant's request, the Plaintiffs made their remaining payments by personal checks.  On August 1, 2018, the Plaintiffs remitted the fourth payment to the Defendant in the amount of $5,624.14.  The final payment was due upon completion of the project.  As of August 15, the Defendant had not completed the project.  The Defendant informed the Plaintiffs he would not finish the roof unless he received the final payment.  The Plaintiffs paid the Defendant $5,000, withholding the remaining $624.14 pending completion of the job.  At this point, the Plaintiffs became concerned about the unfinished work.  They noticed that the construction undertaken by the Defendant seemed incomplete and askew.

---

[1] The chapter 13 case was dismissed in August 2018.  Later, on October 30, 2018, the Defendant started this chapter 7 case.

On August 31, the Defendant gave the Plaintiffs a Current Cost Analysis for review. In that document, he correctly accounted for the amount paid toward the total contract price. He detailed "Material and Equipment" costs of $55,230.72 and set forth three different rates for 396 hours of his labor—a regular rate of $50 per hour, a special rate of $35 per hour, and a military rate of $25 per hour. At this time, the work specified in the original contract remained uncompleted. The parties also executed a written amendment to the contract regarding the completion of the roof.

Toward the end of August, municipal officials conducted an inspection of the project. After that inspection, the Code Enforcement Officer for the Town of Madison, Maine issued an Order of Corrections. The order outlined multiple violations of the International Residential Code and identified questionable construction practices. The Code Enforcement Officer concluded: "Because of the remaining outstanding code violations, as well as questionable construction practices, it is my determination that the garage and attached cabin do not comply with code and should not be utilized or occupied by the owner."

In early September 2018, the Defendant sent the Plaintiffs an invoice seeking payment of $13,860 for 396 hours of his labor at the special rate of $35 per hour. Through the invoice, the Defendant asked the Plaintiffs to pay more than the total contract price of $52,595.07. The invoice was not supported by any documentation as to labor actually performed under the contract. The Plaintiffs have never received any time sheets or other records by which they could verify the number of hours that the Defendant worked on their project. The Plaintiffs never agreed to or approved labor charges that would exceed or increase the total contract price. They refused to pay the additional amounts and notified the Defendant that his work was both incomplete and defective. In response, he threatened to put a mechanic's lien on the property.

The Defendant lacked the skills necessary to construct a garage for the Plaintiffs, and they were left with an unusable, defective garage.  When the project was assessed by another builder, he opined that he had never seen such a "screwed up mess" and that the Defendant had done "an inadequate job in all phases" of the project.  The Defendant's construction was deemed irreparable.  The Plaintiffs paid the Defendant more than $50,000 for worthless services.  The Plaintiffs hired a different contractor who demolished and replaced the Defendant's work with a competently built, Code-compliant two-car garage.

## LEGAL ANALYSIS

Because a motion for judgment on the pleadings "calls for an assessment of the merits of the case at an embryonic stage," the Court views the facts in the light most favorable to the nonmovants and draws all reasonable inferences in their favor.  Vergara-Nuñez, 446 F.3d at 182.  The facts, so viewed, must be measured against the rubric of plausibility—not probability and not possibility.  See Bell Atl. Corp. v. Twombly, 550 U.S. 544, 556-57 (2007).  A complaint states a plausible claim for relief if the well-pleaded factual allegations permit the "reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).  Here, the Complaint contains four counts, each of which is addressed in turn.

I.   **Count I: Objection to Discharge Under 11 U.S.C. § 727(a)(2)(A)**

In Count I, the Plaintiffs allege that the Defendant should be denied a discharge under section 727(a)(2)(A) because, when he contracted with them and took their money, he intended to hinder, delay, or defraud them.  Under section 727(a)(2)(A), the Court may not grant the debtor a discharge if:

> the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed—
>     (A) property of the debtor, within one year before the date of the filing of the petition[.]

- 5 -

11 U.S.C. § 727(a)(2)(A).  The allegations in Count I do little more than parrot the text of the statute.  For this reason, they are not credited as true.  Although the Plaintiffs do not expressly incorporate the other paragraphs of the Complaint into their prayer for relief in Count I (or any of the other counts, for that matter), the Court assumes this incorporation was intended and reviews the rest of the Complaint for allegations that might satisfy the elements of the statutes the Plaintiffs invoke.

Ultimately, the pleading is devoid of any allegations that the Defendant transferred, removed, destroyed, mutilated, or concealed—or that he permitted the transfer, removal, destruction, mutilation, or concealment of—his property within a year before October 30, 2018.  Without any allegations of the offending conduct or the property subject to that conduct, the Plaintiffs fail to state a plausible claim under section 727(a)(2)(A).  *See* Loventhal v. Phillips (In re Phillips), No. 16-13355-JNF, 2017 WL 1900220, at *6 (Bankr. D. Mass. May 8, 2017) (dismissing section 727(a)(2)(A) count under Rule 12(b)(6) where complaint failed to identify property concealed or transferred by the debtor).  The Defendant is therefore entitled to judgment on the pleadings on Count I.

**II.    Count II: Objection to Discharge Under 11 U.S.C. § 727(a)(3)**

In Count II, the Plaintiffs assert that the Defendant's discharge should be denied under section 727(a)(3) because when the Defendant took their money, he "concealed, destroyed, mutilated, falsified, or failed to keep or preserve recorded information, including, but not limited to, documentation from which the Defendant's financial transactions and condition might be ascertained."  Under section 727(a)(3), the Court shall not grant the debtor a discharge if:

> the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case[.]

11 U.S.C. § 727(a)(3). The allegations in Count II do little more than parrot the language of the statute. For this reason, they are not accepted as true.

Elsewhere in the Complaint, the Plaintiffs allege that the invoice of September 2018 was not supported by any documentation as to labor actually performed under the contract, and that they have never received any time sheets or other records by which they could verify the number of hours that the Defendant worked on their project. From these allegations, the Court might be able to infer that the Defendant failed to keep time sheets. But, even if this inference could reasonably be made, it would not support a claim under section 727(a)(3) for two reasons. First, section 727(a)(3) is intended to ensure that creditors, the trustee, and the court can obtain "a reasonably complete picture of the debtor's financial condition during the period prior to bankruptcy." Harrington v. Simmons (In re Simmons), 810 F.3d 852, 857 (1st Cir. 2016). The statute does not guarantee that an individual creditor will be able to secure specific information that might substantiate or undermine his or her claim. It is not designed to address the Plaintiffs' concerns about whether the Defendant actually spent 396 hours on their project. The statute is directed to recordkeeping more generally. Second, the requirement of recordkeeping imposed by the statute is one of "reasonableness under all the circumstances." Razzaboni v. Schifano (In re Schifano), 378 F.3d 60, 68 (1st Cir. 2004) (quotation marks omitted). Here, the circumstances include the parties' written contract—a document designed to govern the parties' relationship—that said nothing about time sheets or any other metric for tracking hours of the Defendant's labor. The Plaintiffs cannot plausibly assert that the Defendant should be denied a discharge under section 727(a)(3) due to his failure to keep time sheets when the contract did not obligate the Defendant to keep time sheets. The Complaint does not state a claim under section 727(a)(3). As such, the Defendant's Rule 12(c) motion will be granted as to Count II.

### III.  Count III: Objection to Discharge Under 11 U.S.C. § 727(a)(5)

In Count III, the Plaintiffs assert that the Defendant's discharge should be denied under section 727(a)(5), which precludes the entry of a discharge if "the debtor has failed to explain satisfactorily . . . any loss of assets or deficiency of assets to meet the debtor's liabilities[.]"  11 U.S.C. § 727(a)(5).  To state a claim for relief under section 727(a)(5), a plaintiff must identify the assets "in question by appropriate allegations in the complaint and [show] that the debtor at one time had the assets but they are no longer available for the debtor's creditors."  Ehle v. Brien (In re Brien), 208 B.R. 255, 258 (B.A.P. 1st Cir. 1997) (quotation marks omitted).  In this proceeding, the Plaintiffs fall far short of this pleading threshold.  They copy the text of the statute nearly verbatim in Count III and otherwise fail to identify any assets that the Defendant once had, but no longer has available to satisfy the claims of his creditors.  The Plaintiffs do not state a plausible claim for relief under section 727(a)(5).  The Defendant's motion for judgment on the pleadings will therefore be granted as to Count III.

### IV.  Count IV: Determination of Dischargeability Under 11 U.S.C. § 523(a)(6)

Finally, in Count IV, the Plaintiffs allege that the Defendant's debt to them should be excepted from discharge under section 523(a)(6) as a debt "for willful and malicious injury to property of Plaintiffs, namely, the acts arising out of or related to a fraudulent construction project that deprived Plaintiffs of monies and property."  The exceptions to discharge found in section 523 are construed narrowly, such that a creditor seeking a determination of nondischargeability must show that its claim comes squarely within one of the enumerated exceptions.  McCrory v. Spigel (In re Spigel), 260 F.3d 27, 32 (1st Cir. 2001).

Section 523(a)(6) excepts from discharge a debt "for willful and malicious injury by the debtor to another entity or to the property of another entity[.]"  11 U.S.C. § 523(a)(6).  In the statute, the word "willful" modifies the word "injury," "indicating that nondischargeability takes

a deliberate or intentional *injury*, not merely a deliberate or intentional *act* that leads to injury." Kawaauhau v. Geiger, 523 U.S. 57, 61 (1998). A debt caused by a recklessly or negligently inflicted injury does not fit within the confines of section 523(a)(6). Id. at 64. Only a debtor "who intentionally acts in a manner he knows, or is substantially certain, will harm another may be considered to have intended the harm and, therefore, to have acted willfully within the meaning of § 523(a)(6)." McAlister v. Slosberg (In re Slosberg), 225 B.R. 9, 19 (Bankr. D. Me. 1998) (footnote omitted); *accord* Old Republic Nat'l Title Ins. Co. v. Levasseur (In re Levasseur), 737 F.3d 814, 818 (1st Cir. 2013). An injury to a person or property is malicious within the meaning of section 523(a)(6) if it is committed "wrongfully and without just cause or excuse[.]" Printy v. Dean Witter Reynolds, Inc., 110 F.3d 853, 859 (1st Cir. 1997) (quoting from and adopting Collier's standard for malicious conduct under section 523(a)(6)). Certain conduct is malicious as a matter of law. *See, e.g.,* Jones v. Svreck (In re Jones), 300 B.R. 133, 140 (B.A.P. 1st Cir. 2003) (concluding that malice was inherent in a finding of liability for sexual harassment). To state a claim under section 523(a)(6), a complaint must contain allegations of conduct that can be classified as both willful and malicious. *See* In re Slosberg, 225 B.R. at 16 ("'Willful' and 'malicious' are distinct elements in the § 523(a)(6) analysis.").

In their oral and written opposition to the Defendant's motion, the Plaintiffs did not identify any cases where damages arising from breach of a construction contract resulted in a determination of nondischargeability under section 523(a)(6). An independent review of the caselaw reveals a number of decisions that undermine the Plaintiffs' position. *See, e.g.,* Scheidelman v. Henderson (In re Henderson), 423 B.R. 598, 625 (Bankr. N.D.N.Y. 2010) (concluding that plaintiffs' allegations were not actionable under section 523(a)(6) where they were based on contractor's "negligence and sub-par performance during construction at their home"); Narang v. Biswas (In re Biswas), No. 07-10440-B-7, 2009 WL 9084765, at *7 (Bankr.

- 9 -

E.D. Cal. Feb. 18, 2009) (concluding that homeowners' damages were the result of negligence, rather than willfulness, where contractor stipulated that he lacked the competence to complete the project, but homeowners failed to show contractor knew he was incompetent when he undertook the project); Taylor v. Kaufmann (In re Kaufmann), 57 B.R. 644, 648 (Bankr. E.D. Wis. 1986) (concluding that contractor's debt to homeowners did not fall within section 523(a)(6) exception to discharge where facts revealed that contractor "negligently but with good intentions undertook and then performed a job he thought he could handle but, after experiencing various problems, discovered that he was unable to undo the resulting damages"); *see also* Scott F. Norberg, Contract Claims and the "Willful and Malicious Injury" Exception to the Discharge in Bankruptcy, 88 Am. Bankr. L.J. 175, 214 (2014) ("The courts have consistently held that debts arising from the breach of a construction or renovation contract are not for willful and malicious injury."). Although the results are generally uniform, the rationale varies from case to case. Some courts hold that section 523(a)(6) bars discharge of damages arising from breach of contract only if the breach is accompanied by tortious conduct. *See* United Providers, Inc. v. Pagan (In re Pagan), 564 B.R. 324, 326 (Bankr. N.D. Ill. 2017) ("An intentional breach of contract . . . is not enough to support a claim under § 523(a)(6) unless the debtor's conduct also gives rise to an independent tort."); Prewett v. Iberg (In re Iberg), 395 B.R. 83, 90 (Bankr. E.D. Ark. 2008) (collecting cases). Some courts do not require proof of tortious conduct but hold that a breach of contract will not trigger section 523(a)(6) if unaccompanied by a subjective intent to inflict injury. *See* Cadillac Vending Co. v. Haynes (In re Haynes), 19 B.R. 849, 851 (Bankr. E.D. Mich. 1982) ("[I]t is amply clear that a debt arising out of a mere breach of contract absent any showing that the purpose of the breach was to cause injury is not a non-dischargeable debt within the meaning of § 523(a)(6)."). Others conclude that an injury caused by breach of contract is "willful" if it was substantially certain to follow from the breach, but nevertheless

suggest that the related debt will be dischargeable if the breach was not "malicious." *See* Wish Acquisition, LLC v. Salvino, No. 07 C 4756, 2008 WL 182241, at *4 (N.D. Ill. Jan. 18, 2008) ("[A] party may intentionally breach a contract with the knowledge that injury may result, but the nature of the injury is in large part foreseeable, and, more importantly, assumed by both parties as part of the risk, or cost, of doing business. The injury is real, but it is not 'malicious[.]'"). Despite this variation, most courts agree that an intentional breach of contract is not, by itself, enough to state a claim under section 523(a)(6). *See* Hernandez v. Musgrave (In re Musgrave), BAP Nos. CO-10-049, 08-25165, 2011 WL 312883, at *11 (B.A.P. 10th Cir. Feb. 2, 2011) ("Generally, an intentional breach of contract, without more, is not the type of injury addressed by § 523(a)(6).").

This Court need not adopt any of the foregoing standards because, under any of them, the Plaintiffs fail to state a claim. The Complaint does not establish that the actions in breach of the parties' contract may also give rise to an independent tort. The Defendant's failure to construct a Code-compliant, usable structure is not the type of conduct that is inherently malicious. And, the Plaintiffs do not allege that the Defendant undertook their project with the intent to build a substandard structure and leave the project uncompleted. The Plaintiffs allege that the Defendant lacked the skills necessary to construct a garage for them, but they do not allege that he knew he lacked the necessary skills. In the absence of a general allegation of the Defendant's state of mind, the ultimate question is whether the pleading permits a reasonable inference that he was substantially certain he would—or subjectively intended to—injure the Plaintiffs or their property. From the Plaintiffs' allegations, it might be reasonable to infer that the Defendant acted with recklessness or negligence in taking on a project for which he lacked the requisite skills. It would also be reasonable to infer that the Defendant, at some point, formed an intent to breach the contract. But the negligence, recklessness, and intentional breach of contract that

ultimately caused the Plaintiffs' harm must be contrasted with the intent to inflict injury that is the hallmark of a claim under section 523(a)(6).  *See, e.g.,* In re Levasseur, 737 F.3d at 819 (affirming determination that Levasseur acted willfully within the meaning of section 523(a)(6) when she deliberately used false pretenses to obtain money from her bank on a home equity line of credit secured by property she no longer owned); Maloney v. Converse, No. 96-1151, 1996 WL 585134, at *1 (1st Cir. Oct. 11, 1996) (affirming determination that Maloney engaged in willful and malicious conduct within the meaning of section 523(a)(6) when he assaulted Converse and murdered her male companion); Piccicuto v. Dwyer, 39 F.3d 37, 41-42 (1st Cir. 1994) (concluding that Piccicuto was entitled to summary judgment against his landlords under section 523(a)(6) where state court had already determined that landlords engaged in a campaign to harass and intimidate Piccicuto).

    The Plaintiffs might wish to hang their hat on a form of *a posteriori* reasoning, asking the Court to infer that the Defendant must have known, at the outset of their contractual relationship, that he would build a defective garage and cabin and inflict financial harm on them, because that is what ultimately happened.  But the Court cannot accept the Plaintiffs' invitation to engage in this reverse-engineered speculation about the state of the Defendant's mind when he executed the contract.  The statute is designed to bar discharge of a debt arising out of conduct that was either intended, or substantially certain, to inflict harm.  Printy, 110 F.3d at 859 (adopting Collier's standard for willful conduct under section 523(a)(6)).  The severity of the harm suffered by the creditor and the relative sympathies of the parties do not drive the analysis; the inquiry instead focuses on the debtor's intentions with respect to the offending conduct.  *See* Roumeliotis v. Popa (In re Popa), 140 F.3d 317 (1st Cir. 1998) (concluding that employee's claims against his employer did not fall within section 523(a)(6) because, although the employer intentionally failed to secure workers' compensation insurance and that failure caused financial injury to

plaintiff in the form of uninsured expenses arising out of a severe workplace assault, the employer did not have the actual intent to injure his employee). This focus on what the pleadings reveal about the debtor's intentions is consonant with the Court's charge to construe the section 523(a)(6) exception to discharge narrowly, in a manner that reserves the benefits of the discharge to the "honest but unfortunate debtor." In re Spigel, 260 F.3d at 32 (quotation marks omitted).

Here, the Complaint does not paint a picture of a contractor who, with malintent, set out to prey upon the finances of unwitting homeowners. Instead, it shows that the Defendant constructed a shoddy structure, leaving the Plaintiffs without any of the anticipated benefits of their bargain. Although the Plaintiffs are sympathetic figures, they have not stated a plausible claim to except their claim against Mr. LaMantia from discharge under section 523(a)(6). The Defendant's Rule 12(c) motion will be granted as to Count IV.

## CONCLUSION

The Defendant is entitled to judgment on the pleadings with respect to Counts I, II, III, and IV of the Complaint. A separate order will enter.

Date: September 30, 2019

Michael A. Fagone
United States Bankruptcy Judge
District of Maine